UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| RONALD S., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:20-cv-1688-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Ronald S. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 12).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 10. Plaintiff also filed a reply brief. *See* ECF No. 11. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 10) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed an application for DIB on February 7, 2018, alleging disability beginning August 23, 2013 (the disability onset date), due to a variety of musculoskeletal and mental health impairments. Transcript ("Tr.") 197-98, 215. Plaintiff later amended his disability onset date to April 20, 2017. Tr. 264. Plaintiff's claim was denied initially on May 10, 2018, after which he requested an administrative hearing. Tr. 16. On February 27, 2020, Administrative Law

Judge John Mastrangelo (the "ALJ") held a hearing in Buffalo, New York. Tr. 16, 74-101. Plaintiff appeared and testified at the hearing and was represented by Kimberly T. Irving, an attorney. Tr. 16. Dale Pasculli, an impartial vocational expert ("VE"), also appeared and testified at the hearing. Tr. 16.

The ALJ issued an unfavorable decision on March 19, 2020, finding that Plaintiff was not disabled. Tr. 16-29. On October 29, 2020, the Appeals Council denied Plaintiff's request for further review. Tr. 1-7. The ALJ's March 19, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.    District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C.  § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ

proceeds to step two and determines whether the claimant has an impairment, or combination of

impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant

restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the

claimant does not have a severe impairment or combination of impairments meeting the durational

requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the

ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically

equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the

"Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing

and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ

determines the claimant's residual functional capacity, which is the ability to perform physical or

mental work activities on a sustained basis notwithstanding limitations for the collective

impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits

him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she

cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the

Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual

functional capacity to perform alternative substantial gainful work which exists in the national

economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168

F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his March 19, 2020 decision:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.

2. The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of April 20, 2017 through his date last insured of June 30, 2019 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: Degenerative Disc Disease; Bilateral Knee Impairments; and Asthma (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 416.967(c)[1] except: the claimant can sit, stand, and walk for six hours each; frequently climb, stoop, kneel, crouch, crawl, and balance; the claimant must avoid concentrated exposure to temperature extremes, wetness, humidity, and pulmonary irritants such as fumes, odors, dusts, gases and poorly ventilated areas.

6. Through the date last insured, the claimant was capable of performing past relevant work as a Corrections Officer, DOT[2] 372.667-018, SVP-4, medium exertional level. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 20, 2017, the amended alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(f)).

Tr. 16-28.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on February 7, 2018, the claimant was not disabled under

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he or she is determined to also be able to do sedentary and light work. 20 CFR 416.967(c).
[2] "DOT" refers to the *Dictionary of Occupational Titles*.

sections 216(i) and 223(d) of the Social Security Act through June 30, 2019, the last date insured. Tr. 29.

## **ANALYSIS**

Plaintiff asserts two points of error. First, Plaintiff argues that the ALJ erroneously found Plaintiff's shoulder, left hand, and mental impairments non-severe at step two of the sequential evaluation,[3] despite substantial evidence which supported a finding that these impairments were severe, and then the ALJ failed to account for all of Plaintiff's impairments, whether severe or non-severe, in the RFC. *See* ECF No. 9-1 at 15-25. Next, Plaintiff argues that the ALJ based Plaintiff's RFC on "mischaracterized evidence, a stale non-examining opinion, and mischaracterizations regarding Plaintiff's activities." *See id*. at 25-30. Accordingly, argues Plaintiff, the ALJ's RFC was not supported by substantial evidence. *See id*.

In response, the Commissioner argues that the ALJ reasonably determined that Plaintiff's shoulder, left hand, and mental impairments were not severe at step two of the sequential evaluation. *See* ECF No. 10-1 at 8-23. The Commissioner also responds that the ALJ's decision was based on substantial evidence, not on a misunderstood opinion, a stale opinion, or his own lay opinion, as Plaintiff argues. *See id*. at 30.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The

---

[3] The Court notes that Plaintiff does not challenge the ALJ's finding that Plaintiff's hypertension and obesity, his alcohol abuse, and his asthma were also not severe. *See generally* ECF No. 9-1. Because Plaintiff does not challenge these findings in his brief, the Court declines to address these issues in this opinion. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal); *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review, the Court finds that the ALJ's decision was supported by substantial evidence, including Plaintiff's largely unremarkable clinical findings; the prior administrative medical findings of a state agency medical consultant; the opinion of a consultative examiner, and Plaintiff's reported activities, which included international travel, hunting, and gardening, as well as Plaintiff's admission that he was actively looking for work but could not find any. Accordingly, the ALJ reasonably determined that Plaintiff retained the RFC to perform a range of medium work (including his past relevant work as a Corrections Officer), and thus, he was not disabled.

On April 7, 2014, Plaintiff underwent right shoulder arthroscopic debridement and revision rotator cuff repair surgery. Tr. 273-74. On June 17, 2014, Plaintiff underwent left L4-5 hemilaminotomy and microdiscectomy surgery. Tr. 283-84. On March 3, 2015, Plaintiff underwent L4-5 decompression, L4-5 transforaminal discectomy and interbody fusion with spacer, and L4-5 posterolateral fusion with instrumentation surgery. Tr. 305-06. On January 22, 2016, Plaintiff underwent left shoulder arthroscopy with extensive debridement of the glenohumeral joint, biceps, labrum, and rotator cuff, subacromial decompression, excision of subacromial bursa, excision of coracoacromial ligament, anterior acromioplasty, and rotator cuff debridement. Tr. 979-80.

On May 11, 2016, Plaintiff underwent a Department of Veterans Affairs ("VA") disability claim exam (also known as a compensation and pension, or C&P, exam) with Alice M. Barber, PA ("Ms. Barber"), for a left forearm scar he received while in the military when his arm went through a glass window. Tr. 590-604. The scar was painful and itchy with a tingling/vibrating sensation and caused loss of sensation and weakness in the left hand and decreased grip strength.

Tr. 597. Plaintiff reported he could lift 15 pounds and had limitations in fine motor movements, manipulating the left hand, carpentry, and buttons. *Id*. He had severe neuropathy of the radial and median nerves in left upper extremity leading to atrophy and weakness of muscles innervated by these nerves; the effects on occupational activities included decreased manual dexterity, problems with lifting and carrying, decreased strength, and upper extremity pain; he had 4/5 grip on the left, decreased sensation to light touch of the left hand/fingers and inner/outer forearm, incomplete moderate paralysis of the radial and median nerves; and he had weakness and issues with the use of his left hand, especially with repetitive use. *Id*.

On April 2, 2016, and May 17, 2016, Plaintiff underwent C&P exams with VA psychologist William A. Reynolds ("Dr. Reynolds"), for mental disorders, including unspecified depressive disorder and alcohol use disorder. Tr. 605-19. His symptoms included crying spells, guilt, hopelessness, loss of usual interests, low self-esteem, diminished sense of pleasure, low mood, and low motivation. Tr. 606. The examiner opined that Plaintiff's depression was "aggravated by the impact of his physical health issues, including his service-connected physical health conditions, on his ability to function both socially and occupationally." *Id*.  Plaintiff drank daily up to 3-4 glasses of wine followed by 6 shots of liquor. *Id*. The examiner opined that Plaintiff had occupational and social impairment with reduced reliability and productivity (Tr. 607) and assessed that "it [was] at least as likely as not that the alcohol abuse was self-medication of his symptoms (Tr. 610-11).

On December 22, 2016, Plaintiff treated at the VA for a follow-up psychiatric assessment and medication management consultation with nurse practitioner Kathleen A. Vertino, DNP-PMHMP-BC, CARN-AP ("Ms. Vertino"), for. Tr. 673-75. Plaintiff had not been seen for over a year because he was receiving his psychotropic medications from his primary care provider. Tr.

674. However, Plaintiff had been referred back to the mental health clinic for primary care because he cut himself after a difficult breakup.  *Id*. He also reported cutting himself in the past to relieve stress, but he denied any cutting behavior since that time and denied he was trying to hurt himself. *Id*. Plaintiff reported he was planning a trip to Iceland in one week; and he just sold his house and needed to find a new one. *Id*. He was diagnosed with PTSD and depression. *Id*. Bupropion, Lorazepam, and Prazosin were continued; Plaintiff was warned not to drink alcohol when taking Lorazepam and agreed to take medications only as prescribed. *Id*.

On January 9, 2017, Plaintiff treated with Gregory Castilgia, M.D. ("Dr. Castilgia"), at UB Neurosurgery for neurosurgical evaluation. Tr. 491-92. He reported a flare- up of neck pain radiating through the left shoulder over the summer without any new injury; his pain had since improved, and he was largely asymptomatic at the time of the visit. Tr. 491. His physical examination was unremarkable; his posterior cervical spine was nontender to palpation; he had full range of motion ("ROM") in all directions; full upper extremity strength; and intact reflexes and sensation. Tr. 492. Plaintiff was encouraged to continue using over-the-counter anti-inflammatories as needed and maintain an active lifestyle with continued yoga and an exercise routine at the gym. *Id*.

On January 30, 2017, Plaintiff treated with Ms. Vertino for medication management. Tr. 672-73. He reported he was "doing good" and denied problems since his last visit: he went to Iceland and "enjoyed himself;" and work was "OK." Tr. 673. He reported his medications have been effective and he was very careful about his use of alcohol." *Id*. His medications were continued. *Id*. Plaintiff stated he was not interested in therapy at this time, and Ms. Vertino opined that Plaintiff did not appear to be in need of therapy. *Id*. On March 13, 2017, Plaintiff had a follow-up medication management visit with Ms. Vertino. Tr. 668-69. He reported some trouble adjusting

to his new environment, as he had just moved, and his sleep had been somewhat disturbed. Tr. 668. He denied any cutting behavior despite the recent stress of moving. *Id*. He was taking less Lorazepam, and his medications were continued. Tr. 668-69.

On March 30, 2017, Plaintiff treated with orthopedic surgeon Michael T. Grant, M.D. ("Dr. Grant"), for a scheduled loss of use disability evaluation for his work-related injury to his left shoulder. Tr. 987-89. He was status-post arthroscopic surgery of that shoulder and complained of aching and discomfort, early morning stiffness, and discomfort with loss of strength and endurance, particularly with his arm overhead and away from his body, as well as loss of motion. Tr. 987. Examination of the left shoulder revealed the wounds to be well-healed; 160 degrees of forward flexion; 110 degrees of abduction; 60 degrees of external rotation, and internal rotation to the level of L3 with some crepitus. *Id*. He had no gross instability, and his neurovascular status was intact. *Id*. Dr. Grant assessed Plaintiff's total scheduled loss of use of his left arm was 60%, with 10% for scheduled loss of use for rotator cuff tear; 10% for forward flexion limited to 160 degrees; 30% for abduction limited to 110 degrees; and 10% for mild restriction of internal and external rotation. Tr. 988.

On April 17, 2017, Plaintiff treated at the VA for primary care, complaining of chronic fatigue, lack of energy, lack of motivation, alcohol overuse, and insomnia. Tr. 661-67. He also complained he was still having nightmares. *Id*. Plaintiff reported he sometimes drank "excessively but not to the degree he had been previously," and he was no longer cutting himself. Tr. 661. His provider offered substance abuse counseling and a weight management program, which Plaintiff declined. Tr. 662, 667.

On April 19, 2017, Plaintiff treated with Ms. Vertino for medication management. Tr. 660-61. He reported no motivation to do anything, but he went to the gym daily and had plans for

upcoming trips with his daughter and brother. Tr. 660. He had a limited social life outside of family and a few friends; he reported that a recent visit from a friend turned into a "boozefest." *Id*. He was eating and sleeping well and taking his medications as prescribed. *Id* Although he stated he did not see a lot of purpose in his life at this point, he had no plans to harm himself. *Id*. On June 15, 2017, Plaintiff told Ms. Vertino that he had been about the same with no acute complaints; he planned to travel this summer for long weekends; he had been seeing his ex-wife, with whom he had an up and down relationship; and his medications were continued. Tr. 644-45.

Plaintiff had a medication management visit with Ms. Vertino on September 14, 2017. Tr. 535-36. He reported he had cut himself once in July when he was in a funk and argued with his ex-wife. Tr. 535. He requested Prazosin because he had been having more frequent dreams; he avoided social activities and crowds; and he was hypervigilant, irritable, and short tempered at times. *Id*. Prazosin was prescribed, and Bupropion and Lorazepam were continued. *Id*.

During a VA primary care visit on September 19, 2017, Plaintiff reported he had been feeling well recently; things had been good at home; he was in a better relationship; he was still very tired during the day but refused a sleep study because he could not tolerate the mask; and he continued to drink daily but less than he had been. Tr. 529-35.

On September 28, 2017, Plaintiff treated with Dr. Grant, complaining of "pain and discomfort with swelling, popping, snapping, catching, and giving way about the right knee." Tr. 990. Upon examination, he appeared a bit uncomfortable; he ambulated with an antalgic gait; he had mild effusion with a boggy synovitis with limited ROM 3-120 degrees with crepitus; joint line tenderness; and positive McMurray with tibial rotation. Tr. 991. X-rays of both knees demonstrated no obvious acute bony pathology and no evidence of fracture or dislocation, with subtle narrowing of the medial joint space. *Id*. Dr. Grant encouraged ice, gentle range of motion,

and non-steroidal anti-inflammatory medication and recommended an MRI. On October 12, 2017, Plaintiff treated with Dr. Grant for follow up. Tr. 993-94. His MRI showed postoperative changes from large partial medial meniscectomy; the lateral meniscus was intact; ACL, PCL, MCL, and LCL within normal limits; no acute osseous findings; and mild chondrosis medial compartment. Tr. 993. A knee injection was administered, and Plaintiff was directed to continue with icing, flexibility, and ibuprofen. Tr. 994.

On November 13, 2017, Plaintiff treated with Ms. Vertino for medication management; his nightmares were considerably reduced by the Prazosin; other than that, he was largely unchanged; he went hunting with his brother, had a bad day then snapped out of it the next day; he was still not socializing much; and his medications were continued. Tr. 527-28.

On November 28, 2017, Plaintiff treated with Dr. Grant for follow up. Tr. 995-96. The cortisone injection at the last visit was of "transient value." Tr. 995. Conservative care versus repeat arthroscopic surgery were discussed, and Plaintiff said he would take some time to think about it. *Id*. On February 27, 2018, and April 10 and 18, 2018, Plaintiff treated with Dr. Grant for follow up; he wished to proceed with arthroscopic surgery, and authorization was requested. Tr. 997-1002.

On April 11, 2018, Plaintiff underwent an internal medicine consultative examination with John Schwab, D.O. ("Dr. Schwab"), at the request of the Division of Disability Determination ("DDD"). Tr. 693-97. On physical exam, Plaintiff was in no acute distress; he had normal gait; he could walk on his heels and toes without difficulty; he was able to rise from a chair without difficulty; his squat was full; and his stance was normal. Tr. 694-95. Plaintiff's cervical spine showed full flexion and extension; no abnormality in the thoracic spine; and his lumbosacral spine showed extension 10 degrees, flexion 70 degrees, and lateral flexion and rotary movement full

bilaterally. Tr. 695. He had full ROM in the bilateral shoulders and knees with stable joints and full strength in the upper and lower extremities. Tr. 695-96. Although Plaintiff had numbness in the thumb, index, and middle fingers of the left hand, he had intact hand and finger dexterity; full grip strength bilaterally, and he was able to button a button, zip a zipper, use Velcro with each hand, and tie a bow with both hands. Tr. 696.

An x-ray of the lumbosacral spine showed laminectomy and posterior fusion at L4-L5, straightening, old minimal compression fracture of the L1, and asymmetric transitional L5 vertebral body. Tr. 691, 696. An x-ray of the right shoulder showed status-post surgery. Tr. 692, 696. Dr. Schwab diagnosed Plaintiff with hypertension, uncontrolled, history of neck pain and backache, history of asthma, and numbness three fingers of left hand, status-post laceration and opined that Plaintiff had mild restriction to lateral flexion bilaterally of the cervical spine and mild restriction to feeling objects with the thumb, index, and middle fingers of the left hand. Tr. 696.

On April 17, 2018, Plaintiff underwent a psychiatric consultative examination with Janine Ippolito, Psy.D. ("Dr. Ippolito"). Tr. 699-703. Plaintiff reported that his employment had ended in 2013 when he retired after 25 years. Tr. 699. Plaintiff also that he had been searching for and applying to multiple jobs, but he had no success finding work. *Id*. On mental status exam, his posture was somewhat tense; motor behavior was somewhat restless; eye contact was appropriate; his mood was reported as mildly aggravated; insight was fair to good; and judgment was fair. Tr. 701-02. Dr. Ippolito opined that Plaintiff could use reason and judgment to make work-related decisions with mild limitations; he could regulate emotions, control behavior, and maintain well-being with moderate limitations; these limitations were due to his emotional distress and alcohol use; and these appeared consistent with psychiatric and substance abuse problems, but they did not appear to be significant enough to interfere with his ability to function on a daily basis. Tr. 702.

12

Dr. Ippolito diagnosed Plaintiff with major depressive disorder, recurrent, moderate, unspecified trauma-related disorder, and alcohol use disorder, current use. Tr. 703.

On April 23, 2018, Plaintiff attended a preoperative visit with Michela M. Kaminski, PA ("Ms. Kaminski"), at Buffalo Medical Group ("BMG"), at the request of Dr. Grant. Tr. 747-53. On April 30, 2018, Dr. Grant performed right knee arthroscopy with partial medial and lateral meniscectomy, debridement, and chondroplasty of medial and patellofemoral compartments. Tr. 1003-04. During his one-week post-op visit on May 8, 2018, Plaintiff appeared comfortable and denied anything unusual, and he was using crutches for gait support. Tr. 1005-06.

On April 30, 2018, state agency psychological consultant L. Blackwell, Ph.D. ("Dr. Blackwell"), reviewed Plaintiff's file as it existed on that date and opined that Plaintiff had moderate limitations in the ability to interact with others, mild limitations in the ability to concentrate, persist, or maintain pace and adapt or manage oneself, and no limitations in the ability to understand, remember, or apply information; and he was moderately limited in interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 108-09, 113-14.

On May 8, 2018, state agency medical consultant R. Mohanty, M.D. ("Dr. Mohanty"), reviewed Plaintiff's file as it existed on that date and opined that Plaintiff could perform medium exertion work with about six hours total of standing and/or walking, about six hours total of sitting, frequent climbing of ramps, stairs, ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling, and he should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation. Tr. 110-13.

On May 10, 2018, Ms. Vertino completed a mental residual functional capacity questionnaire regarding Plaintiff's PTSD and depression. Tr. 711-15. She reported she had treated Plaintiff since September 2014. Tr. 711. She opined that Plaintiff was seriously limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation; he had a limited but satisfactory ability to remember work-like procedures, understand, remember, and carry out very short and simple instructions, maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions, understand, remember, and carry out detailed instructions, set realistic goals or make plans independently of others, and deal with stress of semiskilled and skilled work; his psychiatric condition exacerbated his experience of pain or other physical symptoms; he was likely to be absent from work more than four days per month; alcohol or substance abuse did not contribute to his limitations; he could not engage in full-time competitive employment on a sustained basis; and he had been this limited since approximately one year ago. Tr. 713-15.

On June 20, 2018, Plaintiff treated with orthopedic surgeon David M. Fisher, M.D. ("Dr. Fisher"), complaining of right shoulder pain over the past several months. Tr. 716-17. He denied any traumatic injury but stated he had been active around the house doing gardening and moving mulch. Tr. 716. The pain was located over the deltoid and worse with overhead activities; the pain improved with rest and activity modification. *Id*. On examination, Plaintiff had impingement with Neer and Hawkins maneuvers on the right shoulder and full strength in the rotator cuff muscle and full strength at C5-T1. *Id*.  X-rays showed cysts in the humeral head/greater tuberosity from his previous rotator cuff repair and chronic degenerative changes noted at the acromioclavicular joint. Tr. 717. Dr. Fisher ordered an MRI and discussed the possibility of physical therapy, cortisone injections, or surgery, depending on the MRI results. *Id*.

On June 25, 2018, an MRI of the right shoulder showed full-thickness tear supraspinatus tendon, defect approximately 24mm; infraspinatus tendinopathy with possible minimal partial thickness tear distally; glenohumeral and acromioclavicular joint osteoarthritis; small volume fluid in the subacromion subdeltoid bursa and small glenohumeral joint effusion; and evidence of prior rotator cuff surgery. Tr. 718-19. On July 11, 2018, Plaintiff treated with Dr. Fisher to review his MRI results. Tr. 720. On physical exam, Plaintiff's right shoulder rotator cuff muscle strength was grossly intact; there was no shoulder effusion; and he had full range of motion. *Id*. Dr. Fisher recommended activity modification and repeat clinical check as neededm as the success rate of revision rotator cuff repair was most likely less than 50% given his two prior surgeries and recurrent tears. *Id*.

On September 24, 2018, Plaintiff treated with Ms. Vertino for medication management; Tr. 935-36. He reported he was still stressed over his mother, and he had gotten remarried to his ex-wife. Tr. 935. He had stopped taking Prazosin due to "weird dreams," but he was adhering to

his psychotropic medications. *Id*. He also reported he was not drinking as much, and he went to the country to decompress. *Id*. Plaintiff was again warned of the dangers of combining alcohol with his prescription medications. Tr. 936.

On October 29, 2018, Plaintiff treated with Ms. Kaminski at BMG, complaining of left posterior knee pain for the past month, Tr. 755-57. On examination, he had minimal/mild tenderness of the posterior knee; limited flexion to the left knee joint; positive Homans sign; and a limping gait favoring his left lower extremity. Tr. 756, X-rays and a venous Doppler were ordered; Prednisone was prescribed; and Plaintiff was referred to orthopedics. Tr. 757. Differential diagnoses included rule out DVT and possible Baker's cyst. Tr. 757.

On November 2, 2018, Plaintiff treated with Andrew L. O'Hara, D.O. ("Dr. O'Hara"), at BMG, for evaluation of his left knee. Tr. 954-58. He had mechanical base symptoms including instability, swelling, pain, and loss of motion, and an MRI was ordered. Tr. 954. On November 12, 2018, Dr. O'Hara diagnosed a medial meniscal tear, patellofemoral chondromalacia, joint effusion, medial plica, and small Baker's cyst, and arthroscopic surgery was recommended. Tr. 958-61.

On December 18, 2018, Plaintiff underwent a left knee lateral meniscal debridement, partial medial meniscectomy, medial plical excision, and medial femoral condyle chondroplasty surgery. Tr. 961-62. At his two-week post-op visit on December 31, 2018, Plaintiff reported he was pleased with the results, and he denied pain; however, he admitted to slightly twisting his knee that morning while walking his dogs. Tr. 961. On January 28, 2019, he admitted to full return to activities. Tr. 962-63.

On May 10, 2019, Plaintiff treated with Dr. Grant for follow up of his right knee. Tr. 1009-11. He reported progressive pain and motion deficits, start-up pain, and stiffness. Tr. 1009.

Examination of the right knee revealed a small effusion, perhaps a trace varus deformity, ROM 0-120 degrees, and mild crepitus. Tr. 1010. Dr. Grant noted evidence of posttraumatic arthritis and discussed the possibility of a cortisone injection, which Plaintiff declined. *Id*. He was instructed to continue with icing and flexibility and Ibuprofen for pain. *Id*.

On May 16, 2019, Plaintiff attended his medication management visit with Ms. Vertino, Tr. 906-07. He reported multiple stressors and physical complaints, and he was drinking almost daily. Tr. 906. Mr. Vertino warned about drinking combined with his medication, to which Plaintiff responded he was "very careful." *Id*. Ms. Vertino indicated that Plaintiff needed ongoing medication management and relinkage to therapy, and his medications were continued. *Id*.

On May 22, 2019, Plaintiff treated at the VA for outpatient behavioral health counseling. Tr. 903-05. Plaintiff reported he had attended counseling on and off but felt it made things worse. Tr. 903. He reported trouble "dealing with incompetent people" and experiencing a lot of stress in his life, particularly with his mother. Tr. 903-04. He also reported he was drinking "way too much," but he had recently cut back from 3-4 glasses of liquor and 3-4 glasses of wine per day to drinking only 1-2 glasses of wine per day. Tr. 904. He also reported using marijuana 1-2 times per month to go to sleep. *Id*.

On June 27, 2019, Plaintiff treated with Dr. Grant for a scheduled loss of use disability evaluation for his right knee. Tr. 1012-14. On physical exam, Plaintiff ambulated with a mildly antalgic gait; in regard to the right knee, he had a moderate degree of quadriceps atrophy; a boggy synovitis with no effusion; and ROM was 3-100 degrees of flexion with moderate crepitus. Tr. 1014. Dr. Grant assessed a 40% scheduled loss of use of the right leg, with 10% for right knee chondromalacia patella and 30% for right knee flexion limited to 100 degrees. *Id*.

On January 29, 2020, Plaintiff treated with Dr. O'Hara, for evaluation of his right knee. Tr. 1017-21. Dr. O'Hara noted that Plaintiff had previously been managed by Dr. Grant who had recently retired. Tr. 1017. Imaging showed mild to moderate arthritic change, and Dr. O'Hara requested authorization for platelet rich plasma injection. Tr. 1017. Dr. O'Hara opined that the long-term management for Plaintiff's condition "may be total knee arthroplasty down the line," but considering Plaintiff's age, he recommended first exhausting all forms of conservative measures. *Id.*

As noted above, Plaintiff argues that the ALJ erred in assessing the severity of Plaintiff's impairments and also challenges the ALJ's RFC findings. A claimant's RFC is the most he can still do despite his limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Here, Plaintiff filed his claim on February 7, 2018, and therefore, the 2017 regulations are applicable to his claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency.  *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not

disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Plaintiff first argues that the ALJ erroneously found Plaintiff's shoulder, left hand, and mental impairments non-severe at step two of the sequential evaluation, despite substantial evidence which supported a finding that these were severe. *See* ECF No. 9-1 at 15-25. Accordingly, argues Plaintiff, the ALJ failed to account for all of Plaintiff's impairments, whether severe or non-severe, in the RFC. *See id*. However, contrary to Plaintiff's arguments, the ALJ reasonably

determined that Plaintiff's shoulder, left hand, and mental impairments were not severe, and Plaintiff has not met his burden of proving otherwise.

At the second step of the sequential evaluation, an ALJ considers whether the claimant has at least one severe impairment or combination of impairments that meets the twelve-month durational requirement for establishing disability. *See* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not "severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities, which are defined as the abilities and aptitudes to do most jobs. 20 C.F.R. § 416.922; SSR 85-28, 1985 WL 56856 (1985); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). If the claimant does not have any severe impairments, then the claimant is not disabled, and the sequential evaluation ends. *Id*. However, if the claimant has at least one severe impairment or combination of impairments, then the evaluation continues, and the ALJ considers all impairments and symptoms when evaluating RFC. *See* 20 C.F.R. § 404.1529, 404.1545(a)(2).

Furthermore, it is Plaintiff's burden to demonstrate that he has a severe impairment. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). The mere presence of an impairment, or that a person has been diagnosed and/or treated for an impairment is not, by itself, sufficient to render a condition severe. *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013); *see Bergeron v. Astrue*, No. 09-CV-1219, 2011 WL 6255372, at *3 ((N.D.N.Y. Dec. 14, 2011) (quoting *McConnell v. Astrue*, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)) ("The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe."); *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (step two is applied to screen out *de minimis* claims).. Instead, a claimant must demonstrate an impairment that "significantly limits [his] physical or mental ability to perform basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003). Moreover,

an impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

First, the ALJ carefully considered Plaintiff's shoulder impairments and found them to be non-severe. Tr. 19. As the ALJ explained, Plaintiff had shoulder surgeries far before his alleged disability onset date of April 2017, including a right shoulder rotator cuff repair in 2014 (273-74) and a left shoulder arthroscopy in January 2016 (979-80). Tr. 19. However, the mere fact that a claimant had surgery has no bearing on the severity of an impairment; it is the functional impact of the impairment that is of import. *See Karen H. v. Kijakazi*, No. 20-CV-0335-DGL, 2021 WL 3513829, at *2 (W.D.N.Y. Aug. 10, 2021) (affirming ALJ's finding that claimant's carpal tunnel syndrome was not severe because it did not cause significant functional limitations, despite the fact that claimant had surgery during the relevant period).

During the relevant period, the record reflected little to no symptoms of shoulder impairment or limitations. Tr. 19. For instance, the ALJ explained that in March 2017, one month prior to Plaintiff's alleged disability onset date, Dr. Grant examined Plaintiff's left shoulder and found that it had normal flexion with some crepitus, but no instability, and Plaintiff appeared comfortable. Tr. 19, 987. In June 2017, Plaintiff complained of right shoulder pain to Dr. Fisher, but he also said he had been "active around the house with gardening and moving mulch." Tr. 19, 716. Furthermore, as the ALJ explained, Plaintiff's physical examination revealed intact right shoulder strength with no effusion and full range of motion. *See id*. Thus, the ALJ reasonably found that although Plaintiff had shoulder surgeries prior to his alleged disability onset date, during the relevant period, the evidence did not indicate that Plaintiff's shoulder impairments significantly limited his capacity to perform basic work activities. Tr. 19. *See Michael R. v. Comm'r of Soc. Sec.*, No. 19-CV-6836-MJR, 2021 WL 346365, at *4 (W.D.N.Y. Feb. 2, 2021) (plaintiff failed to

provide objective evidence to support his allegations regarding his TBI/seizures and any work-related limitations arising therefrom).

The ALJ also considered statements from Dr. Grant, who examined Plaintiff in March 2017 in connection with his application for workers' compensation and assigned loss of use percentages related to Plaintiff's ability to use his arms, and reasonably found them unpersuasive. Tr. 19-20, 987-88. As the ALJ explained, Dr. Grant's opinion that Plaintiff suffered any percentage loss of function in his shoulders was not supported by Dr. Grant's own examination notes. Tr. 19-20; *see* 20 C.F.R. § 404.1520c(c)(1) ("[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be."). For instance, the ALJ explained that Dr. Grant's March 2017 examination showed normal flexion in the left shoulder, no instability, and that Plaintiff appeared comfortable. Tr. 19-20, 987.  The ALJ further explained that Dr. Grant's opinion was inconsistent with the evidence as a whole, which showed largely normal findings related to Plaintiff's shoulders. Tr. 19-20, 716, 987; *see* 20 C.F.R. § 404.1520c(c)(2) ("[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . will be."). Moreover, the ALJ explained, Dr. Grant's opinion was stated in terms of vague percentages, not functional limitations related to Plaintiff's ability to perform work activities. Tr. 20. Thus, the ALJ reasonably found Dr. Grant's opinion unpersuasive. Tr. 19-20.

Plaintiff attempts to show that his shoulder impairments caused significant limitations, but he cites to evidence that does not actually support this. For instance, Plaintiff cites to a January 2017 visit with neurosurgeon Dr. Castilgia for lower back pain, but at this visit, Plaintiff denied any pain in his upper extremities; had no muscle weakness or paresthesia; said he was "largely

asymptomatic;" and was noted to be "an active gentleman with yoga and a regular gym routine." *See* ECF No. 9-1 at 17 (citing Tr. 491-92). Furthermore, Plaintiff's physical examination was entirely normal, including full (5/5) strength in his upper extremities. Tr. 492.

Plaintiff also cites to his July 2018 visit with Dr. Fisher (*see* ECF No. 9-1 at 17), but the ALJ already considered this visit, and it actually supports a finding that Plaintiff's shoulder impairment was non-severe. Tr. 19, 720. Dr. Fisher examined Plaintiff's right shoulder and found that it was intact, displayed no effusion, and exhibited full range of motion; and an MRI showed no significant muscle atrophy. Tr. 720. Plaintiff highlights that Dr. Fisher recommended "activity modification," because the success rate of further rotator cuff surgery would be less than 50% (Tr. 720), but this alone—particularly in light of Plaintiff's entirely normal physical examination— does not indicate significant limitations on Plaintiff's ability to perform work functions. *See* ECF No. 9-1 at 17.

Next, the ALJ reasonably found that Plaintiff's left-hand impairment was nonsevere. Tr. 19. The ALJ considered that Plaintiff's left-hand injury occurred over 25 years prior to his alleged disability onset date, and Plaintiff had performed his past relevant work as a Corrections Officer (which is categorized as medium work that someone with Plaintiff's RFC could perform) for over 25 years after that injury. Tr. 19, 79-81, 593. Moreover, as the ALJ explained, Plaintiff displayed full grip strength in both hands, and full dexterity, during a consultative examination with Dr. Schwab in April 2018. Tr. 19, 695-96. At this examination, Plaintiff could button, zip, use Velcro, and tie a bow with both hands. Tr. 696.

Plaintiff asserts that a May 2016 C&P exam with the VA establishes that his hand impairment is severe, but this is unavailing. Plaintiff admits that this examination is prior to the relevant period but asserts that it is still "highly relevant" to Plaintiff's current functioning. *See*

ECF No. 9-1 at 18. However, Plaintiff offers no factual or legal support for this conclusory statement and fails to explain why Plaintiff's C&P exam findings are entitled to any particular deference. *See* ECF No. 9-1 at 18. *See Johnson v. Colvin*, No. 13-CV-6319, 2014 WL 1394365, at *6 (W.D.N.Y. April 9, 2014) ("Since Plaintiff is represented by counsel, the Court presumes that if evidence in support of the memorandum's conclusory arguments were to be found, counsel would have cited to it. The Court is not required to comb the record in search of evidence in support of Plaintiff's position."); *see also* 20 C.F.R. § 416.920b(c)(1)-(3) (2017) (evidence from other governmental agencies and nongovernmental entities "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled," and furthermore, the ALJ is not required to provide any analysis about how he considered such evidence in his decision).

Moreover, Dr. Schwab's April of 2018 examination of Plaintiff's left hand is far more recent *and* during the relevant period; and, as stated above, this examination showed full grip strength and dexterity in both hands and Plaintiff was able to perform tasks such as buttoning and tying a bow with his left hand. Tr. 19, 695-96. Moreover, Plaintiff testified he was able to hunt and lift light weights on machines at the gym. Tr. 19, 83-85. Additionally, as noted above, Plaintiff's left-hand injury occurred over 25 years prior to his alleged disability onset date, and he was able to work for 25 years afterwards without limitation. Tr. 19, 79-81, 593. Accordingly, Dr. Schwab's examination supports the ALJ's finding that Plaintiff's left-hand impairment was nonsevere. *See, e.g., George A. v. Comm'r of Soc. Sec.*, No. 20-CV-00691-MJR, 2021 WL 2102527, at *5 (W.D.N.Y. May 25, 2021) (ALJ's finding that claimant's hand impairment was nonsevere supported by examination showing normal grip strength and dexterity).

Plaintiff's argument that the ALJ erred by not reconciling Dr. Schwab's assessment that Plaintiff had a mild restriction in feeling objects with his left thumb, index, and middle fingers

with the RFC finding is similarly unavailing. *See* ECF No. 9-1 at 20-22. Again, Plaintiff cites no

support for his assertion that Dr. Schwab's opinion is inconsistent with the RFC for medium work,

or Plaintiff's ability to perform his past relevant work as a Corrections Officer. *See* ECF No. 9-1

at 20-22; *Johnson*, 2014 WL 1394365, at *6. Plaintiff attempts to compare the ALJ's finding in

his case with *McFarland-Deida v. Berryhill*, 17-CV-6534-FPG, 2018 WL 1575273, at *4

(W.D.N.Y. Apr. 2, 2018). However, that case is readily distinguishable.

In *McFarland-Deida*, the ALJ erred by failing to reconcile a consultative examiner's

opinion of mild limitations in fine motor activity with an RFC for medium work with frequent

reaching, handling, and fingering. *McFarland-Deida*, 2018 WL 1575273, at *4. Such is not the

case here. There is no need to reconcile Dr. Schwab's opinion, because medium work does not

require the ability to feel objects with all fingers of both hands. *See* SSR 96-9p, 1996 WL 374185,

at *8 ("[t]he ability to feel the size, shape, temperature, or texture of an object by the fingertips is

a function required in very few jobs . . . "). Furthermore, the DOT explains that fingering and

feeling are "not present" in Plaintiff's prior relevant work as a Corrections Officer. DOT 372.667-

018. Thus, even if the ALJ did not explicitly discuss Dr. Schwab's opinion that Plaintiff had a mild

limitation in feeling with three fingers on his left hand, this has no impact on the ALJ's ultimate

finding that Plaintiff could perform his past relevant work and other work at the medium exertional

level.

In addition, contrary to Plaintiff's assertion (*see* ECF No. 9-1 at 18-20), the ALJ reasonably

and appropriately considered Plaintiff's activities of daily living, an indicator of his level of

functioning. Tr. 19; *see* 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2017 WL 5180304 (Oct. 25,

2017); *Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013); *Poupore*, F.3d at 307. For instance,

the ALJ considered that Plaintiff reported, during the relevant period, gardening and carrying

mulch and hunting. Tr. 19-20, 83, 716. Further, Plaintiff told Dr. Ippolito that he cooked, cleaned, washed laundry, went grocery shopping, drove, dressed independently, and exercised at the gym, and he reported similar activities to Dr. Schwab Tr. 702, 694. Plaintiff also reported that he could take care of his dogs and his personal care needs; shop in stores and online; and he attended church twice a month.  Tr. 224-30. These activities support a finding that Plaintiff's shoulder and left-hand impairments were nonsevere, as does the other medical evidence discussed above, which the ALJappropriately considered. Tr. 19. Thus, the ALJ reasonably found Plaintiff's bilateral shoulder and left-hand impairments to be nonsevere.

Finally, the ALJ reasonably found that Plaintiff's medically determinable mental impairments of anxiety disorder, depressive disorder, and post-traumatic stress disorder ("PTSD"), considered singly and in combination, did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and, therefore, were nonsevere. Tr. 20-23. First, the ALJ reasonably considered Plaintiff's testimony that he saw a psychologist approximately once every two months, and he saw a counselor only during "rough patches." Tr. 20, 88. The ALJ also noted Plaintiff's testimony that he stops seeing the counselor when he's "doing well." *Id*. The Court notes that Plaintiff's reference to psychologist visits every two months (Tr. 88) appear to refer to his medication management visits with nurse practitioner Ms. Vertino, most of which do not reference any counseling treatment or therapy. *See, e.g.*, Tr. 673-75, 672-73, 668-69, 660-61,644-45, 535-36, 527-28, 935-36, 906-07. For example, on January 30, 2017, Plaintiff reported his medications had been effective; he was very careful about his alcohol use; and he was not interested in therapy at that time. Tr. 673. Ms. Vertino agreed that Plaintiff did not appear to be in need of therapy. *Id*. It was not until some 15 months later, in May 2019, that Ms. Vertino recommended "relinkage to therapy" after Plaintiff reported "a great deal of stress" and "drinking

almost daily." Tr. 906. *Id*. This evidence supports the ALJ's finding that Plaintiff's mental impairments were not severe. *See Reeves v. Comm'r of Soc. Sec.*, No. 19-CV-775S, 2020 WL 4696589, at *6 (W.D.N.Y. Aug. 13, 2020) (infrequency of treatment supports a finding that an impairment is non-severe).

The ALJ also explained that the record showed Plaintiff's depression and PTSD were stable with medication. Tr. 20, 532, 766. It is proper for the ALJ to consider improvement with treatment. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (improvement with treatment is properly considered in concluding claimant not disabled); *Rivera v. Colvin*, No. 1:14-CV-00816 (MAT), 2015 WL 6142860, at *6 (W.D.N.Y. Oct. 19, 2015) (citing *Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2014)) (ALJ may consider conservative treatment); *see also* 20 C.F.R. § 416.926a(a)(3) (ALJ must consider the effects of medications or other treatment on a claimant's ability to function). Further, the ALJ considered that Plaintiff's treatment records revealed largely normal mental status examinations, including that Plaintiff was cooperative and pleasant; was alert and oriented; and had normal attention and concentration, normal memory, normal mood and affect, and normal judgment. Tr. 20, 525, 528, 620, 750.

The ALJ then applied the "special technique" to find Plaintiff's mental impairments nonsevere. Tr. 22-23. When a claimant allegedly suffers mental impairments, the ALJ is required to follow a "special technique" at each level of the administrative review process to determine whether the claimant has any severe mental impairments and whether the impairments meet or equal the Listings. 20 C.F.R. § 404.1520a. Specifically, the ALJ must assess the claimant's degree of functional limitation resulting from a mental impairment in four broad functional areas identified in Paragraph B of the adult mental disorders listings. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). As previously noted, Plaintiff traveled and was able to take care of his dogs and

his personal care needs, as well as pay bills, handle a savings account, count change, and shop in stores and online, and attended church twice a month. Tr. 525, 528, 620, 750. Accordingly, the ALJ reasonably determined that Plaintiff had no limitation in his ability to understand, remember, or apply information and only mild limitations in his abilities to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. 22-23.

Plaintiff also alleges that the ALJ erred by rejecting all opinions on Plaintiff's mental functioning, but this is simply incorrect. *See* ECF No. 9-1 at 22-24. In fact, the ALJ found a prior administrative medical finding from state agency psychological consultant Dr. Blackwell partially persuasive, explaining that Dr. Blackwell's finding that Plaintiff had no limitations in his ability to understand, remember, or apply information and mild limitations in his abilities to concentrate, persist, or maintain pace and adapt and manage himself was consistent with, and supported by, the record. Tr. 20, 108. The ALJ considered that the record indicated improved mental health symptoms, such as Plaintiff's reports of decreased nightmares with medication, and largely normal mental status examination results, as discussed above, and incorporated these findings into his evaluation. Tr. 20, 22, 527, 525, 528, 620, 750.

However, the ALJ reasonably found Dr. Blackwell's finding that Plaintiff had moderate limitations in interacting with others unsupported by, and inconsistent with, the record. Tr. 20. As the ALJ explained, there was no evidence in the record that Plaintiff had trouble interacting with others; rather, the record showed that Plaintiff socialized and was cooperative and pleasant at appointments. Tr. 20, 525, 528, 225. Thus, the ALJ did not reject the opinion, as Plaintiff alleges, but rather, the ALJ properly incorporated Dr. Blackwell's prior administrative finding into his decision only to the extent that it was supported and consistent. *See Veino*, 312 F.3d at 588 (an

ALJ's duty is to resolve genuine conflicts in the record, and an ALJ is free to reject portions of medical opinion evidence not supported by evidence of record).

Similarly, the ALJ did not reject the April 2018 opinion of consultative examiner Dr. Ippolito, as Plaintiff alleges. *See* ECF No. 9-1 at 23-24. Rather, the ALJ found Dr. Ippolito's opinion "partially persuasive." Tr. 21, 702. In particular, the ALJ found persuasive Dr. Ippolito's opinion that Plaintiff had no limitation in his ability to: understand, remember, and apply simple and complex directions and instructions; interact adequately with supervisors, coworkers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; maintain personal hygiene and appropriate attire; and, demonstrate awareness of normal hazards and take appropriate precautions with no evidence of limitation; and her opinion that Plaintiff had only a mild limitation in his ability to use reason and judgment to make work-related decisions.  Tr. 21, 702. However, the ALJ disagreed with Dr. Ippolito's opinion that Plaintiff had a moderate limitation in his ability to regulate emotions, control behavior, and maintain wellbeing. Tr. 21, 702. As the ALJ explained, the record did not indicate any moderate limitations, but rather essentially benign mental status examinations, good activities of daily living, and that Plaintiff often reported doing well to mental health providers. Tr. 21, 525, 528, 620, 750 889, 224, 227-28. Thus, the ALJ reasonably found Dr. Ippolito's opinion only partially persuasive.

Notably, Dr. Ippolito also found that Plaintiff's limitations were due to his "emotional distress and alcohol use," not due to a mental impairment. Tr. 702. She also opined that Plaintiff's psychiatric problems were not "significant enough to interfere with [his] ability to function on a daily basis." Tr. 702. Thus, contrary to Plaintiff's allegations, the ALJ's step two finding was largely supported by, and consistent with, Dr. Ippolito's opinion, and thus, Plaintiff's assertion that the ALJ erred by basing his step two findings on his own lay opinion is without merit. As

explained, the ALJ's step two findings were based, in part, on the prior administrative medical finding from Dr. Blackwell and Dr. Ippolito's opinion, both of which the ALJ found partially persuasive. Furthermore, there is no requirement that the ALJ accept every limitation in a medical source's opinion. *See Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (holding that the ALJ properly declined to credit certain conclusions in a medical source's opinion that were inconsistent with other evidence of record). Moreover, there is no requirement that an ALJ's RFC finding be based on a medical opinion at all. *See, e.g.*, *Corbiere v. Berryhill*, 760 F. App'x 54, 56-57 (2d Cir. 2019) (summary order) (affirming ALJ's physical RFC assessment based on objective medical evidence); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (affirming where ALJ rejected sole medical opinion in record speaking to mental functioning).

Plaintiff's contention that the April 2, 2016 and May 17, 2016 VA C&P exams (Tr. 605-19) support a finding that his mental impairments were severe is likewise without merit. *See* ECF No. 9-1 at 23. Although the ALJ considered the C&P exams and explained why he found them unpersuasive, he was not required to do so, as they were not medical opinions under the regulations that apply to Plaintiff's claim. Tr. 21, 607. *See* 20 C.F.R. § 404.1513(a)(2)(ii) (stating that a "medical opinion is a statement from a medical source about . . . whether you have one or more impairment-related limitations or restrictions in the following abilities . . . [including the] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting"). Moreover, the ALJ reasonably found these statements unsupported by, and inconsistent with, the record, which indicated little or mild mental health limitations, largely benign mental status examinations, and a wide array of activities of daily living, as discussed above. Tr. 21, 83, 224-30, 525, 528, 620, 660, 694, 716, 750. The ALJ also appropriately considered that Dr. Reynolds' findings were stated in vague,

conclusory terms that failed to provide any functional limitations beyond noting that Plaintiff had an impairment, and therefore, were of little use. Tr. 21.

Next, contrary to Plaintiff's assertions otherwise (*see* ECF No. 9-1 at 23), the ALJ reasonably found unpersuasive the May 2018 mental residual functional capacity questionnaire submitted by nurse practitioner Ms. Vertino (Tr. 711-15). Tr. 21. As the ALJ explained, Ms. Vertino failed to cite any evidence to support her opinion. Tr. 21. The ALJ also explained that Ms. Vertino's opinion was inconsistent with the record as a whole, which, as previously explained, revealed largely normal or mild findings. Tr. 21. Thus, the ALJ reasonably found this opinion unpersuasive. Tr. 21. *See* 20 C.F.R. § 404.1520c(c)(1)-(2) (explaining that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)" and the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be.").

Plaintiff's assertion that his "cycles of improvement, stability, and increased symptomology" during his course of treatment with Ms. Vertino supports a finding that Plaintiff's mental impairments were severe is unpersuasive. *See* ECF No. 9-1 at 23. As noted above, Plaintiff's treatment notes throughout the relevant period reflect mostly normal mental status examinations, including Plaintiff's recent mental status examinations with Ms. Vertino. In fact, the treatment notes Plaintiff cites to support his argument show entirely normal mental status examinations. *See id.* (citing Tr. 525, 528, 644, 668, 673, 905, 906, 936). Furthermore, to the extent that any treatment notes cited by Plaintiff show any abnormality, it is only that Plaintiff experienced situational life stressors which do not support Plaintiff's allegation of severe mental impairments. Tr. 525, 644, 668. *See Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 83-84 (2d

Cir. 2015) (finding that behaviors precipitated by situational factors rather than longitudinal manifestations of psychological disorders belied the presence of totally disabling functional limitations); *Denea v. Comm'r of Soc. Sec.*, No. 18-CV-779, 2020 WL 994672, at *6 (W.D.N.Y. Mar. 2, 2020) (Although the record showed that plaintiff handled stress poorly at times, the factors cited by plaintiff that caused him stress were largely episodic and/or situational rather than disabling); *Morgan v. Colvin*, No. 6:14-cv-0549 (LEK), 2016 WL 3527907, at *15 (N.D.N.Y. June 23, 2016) (situational stressors are not a basis for a finding of disability).

Plaintiff also alleges that the ALJ erred by not accounting for limitations stemming from his non severe shoulder, left hand, and mental impairments into the RFC finding. *See* ECF No. 9-1 at 25. However, Plaintiff's argument merely rehashes his disagreement with the ALJ's step two finding that Plaintiff's shoulder, left hand, and mental impairments did not significantly limit his ability to perform basic work activities. Here, Plaintiff has not proven that he was more limited with respect to his shoulder, left hand, and mental functioning than the ALJ's RFC finding. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (stating that under the substantial evidence standard of review, it is not enough for claimant to offer a different interpretation of the evidence, he must demonstrate that no reasonable factfinder could have weighed the evidence as the ALJ did in his decision).

It is true that an "RFC determination must account for limitations imposed by both severe and non-severe impairments." *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order); *see also Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 280 (S.D.N.Y. 2019) ("[T]he ALJ must take into account the cumulative effects of ailments, including those that are non-severe.")). However, a "non-severe" impairment is, by definition, a condition which

causes only a "slight abnormality" which would have "no more than a minimal effect on an individual's ability to work." *Cardoza*, 353 F. Supp. 3d at 280. Plaintiff failed to produce evidence indicating that his shoulder, left hand, and mental impairments were sufficiently "severe" to impose more than a "minimal effect" on his ability to work. *See Jones v. Comm'r of Soc. Sec.*, 2018 WL 3829119, at *2-3 (W.D.N.Y. Aug. 13, 2018) (rejecting step two argument because plaintiff failed to show how the claimed impairment "impacted his ability to perform work-related functions"); *see also Sherrill B. v. Comm'r of Soc. Sec.*, No. 17-CV-754, 2018 WL 4150881, at *9 (N.D.N.Y. Aug. 30, 2018) ("Because the ALJ considered the objective medical evidence, Plaintiff's daily activities and the hearing testimony in determining that Plaintiff's diagnosed depression and anxiety did not impose any limitations on her RFC, the ALJ's determination was supported by substantial evidence."). Thus, the ALJ's RFC finding accounts for all of Plaintiff's credibly established limitations, and the record does not compel any reasonable factfinder to have assessed greater restrictions.

In his second point of error, Plaintiff contends that the ALJ based Plaintiff's RFC on "mischaracterized evidence, a stale non-examining opinion, and mischaracterizations regarding Plaintiff's activities," and therefore, his RFC finding was not supported by substantial evidence. *See* ECF No. 9-1 at 25-30. Contrary to Plaintiff's contentions, the ALJ's factual finding that Plaintiff retained the RFC to perform a range of medium work is supported by substantial evidence, such as the largely normal medical evidence, the prior administrative finding of state agency medical consultant, Dr. Mohanty, and Plaintiff's reported daily activities. Plaintiff, therefore, has not met his burden of proving that he was more restricted. *Smith*, 740 F. App'x at 726; *McIntyre*, 758 F.3d 146. Moreover, Plaintiff has not met his burden of proving that he could not perform his past relevant work as a Corrections Officer. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *Jock v. Harris*, 651 F.2d 133 (2d Cir. 1981).

First, Plaintiff alleges that the ALJ improperly relied on an April 2018 opinion from Ms. Kaminski stating that Plaintiff could "participate in strenuous sports such as swimming, tennis, football, basketball, and skiing." *See* ECF No. 9-1 at 25-26 (citing Tr. 26-27, 748, 758). The record reflects that on April 23, 2018, Plaintiff presented to Ms. Kaminski at BMG for a preoperative consultation at the request of Dr. Grant who was scheduled to perform a right knee arthroscopy on Plaintiff on April 30, 2018. Tr. 747-48. Ms. Kaminski's note specifically reads: "Patient['s] functional capacity: Can participate in strenuous sports such as swimming, singles, tennis, football, basketball and skiing (>10 METs[4])." Plaintiff argues that Ms. Kaminski's references to these activities were not opinions but, rather, were references to Plaintiff's May 2, 2017 stress test results of greater than 10 METs. *See* ECF No. 9-1 at 25-26 (citing Tr. 544-545). According to Plaintiff, Ms. Kaminski's statement means that; "from a cardiac perspective, [Plaintiff's] health was characterized as being able to participate in strenuous sports, [but] physically, due to his various physical impairments, he was not able to participate in such activities." *See* ECF No. 9-1 at 26. Thus, argues Plaintiff, the ALJ's "reliance" on these statements resulted in an RFC that was not supported by substantial evidence requiring that remand.

Upon review of the evidence cited by Plaintiff, the Court finds Plaintiff's interpretation of Ms. Kaminski's April 2018 statements unconvincing. Plaintiff provides no relevant support for his assertion that Ms. Kaminski's statement was only in reference to Plaintiff's cardiac, not physical, abilities. Plaintiff only cites to the results of a stress test from a different provider, in a different practice, taken nearly a year prior. *See* ECF No. 9-1 at 25-26. Plaintiff's allegations are based on speculation and thus meritless. Furthermore, even if the ALJ misunderstood Dr. Kaminski's statements

---

[4] "METS" refers to exercise capacity based on metabolic equivalents achieved, as measured through exercise stress testing, a non-invasive, screening test for coronary artery disease, One MET is defined as 3.5 mL O2 uptake/kg per min, which is the resting oxygen uptake in a sitting position). Less than 5 METS is poor; 5–8 METS is fair; 9–11 METS is good; and 12 METS or more is excellent. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6078558 (last visited August 25, 2022).

as Plaintiff argues, this does not render the ALJ's decision unsupported by substantial evidence, as the ALJ's RFC finding was supported by other substantial evidence, as discussed extensively throughout this opinion.

Plaintiff next asserts that the ALJ erred by finding persuasive the prior administrative finding of state agency medical consultant Dr. Mohanty that Plaintiff could perform a range of medium work (Tr. 26, 110-13). *See* ECF No. 9-1 at 26-28. This is without merit. Contrary to Plaintiff's suggestion that Dr. Mohanty's opinion could not constitute substantial evidence because he did not examine Plaintiff (*see* ECF No. 9-1 at 26-27), state agency medical consultants are highly qualified and experts in Social Security disability evaluation, and their prior administrate medical findings must be considered. *See* 20 C.F.R. § 404.1513a(b)(1). Moreover, the revised regulations make clear that supportability and consistency are the most important factors in determining the persuasiveness of a medical opinion or prior administrative medical finding —not the relationship between the medical source and the claimant. *See* 82 Fed. Reg. at 5853, 5857-58; 20 C.F.R. § 404.1520c(b)(2)-(3), (c)(1)-(2). Thus, the ALJ did not err by finding Dr. Mohanty's prior administrative finding persuasive.

Dr. Mohanty's finding is also not stale, as Plaintiff alleges. *See* ECF No. 9-1 at 27-29. A medical opinion may be rendered stale if it does not account for a plaintiff's deteriorating condition. *See Carney v. Berryhill*, No. 16-CV-269, 2017 WL 2021529, at *6 (W.D.N.Y. May 12, 2017). "However, a medical opinion is not necessarily stale simply based on its age." *Biro v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 464, 470 (W.D.N.Y. 2018); *Hernandez v. Colvin*, 15-CV-6764, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order)) ("[A] medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]."). Overall, remand is warranted where more recent evidence in the record "directly contradict[s] the older reports of [claimant's] functioning on which the ALJ relied" and the ALJ failed to analyze the more

recent evidence. *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642 (2d Cir. 2020). Where the submitted evidence did not directly contradict a doctor's opined limitations and further the ALJ analyzed the recent evidence, the doctor's opinion was not impermissibly stale.

Dr. Mohanty examined the record and rendered his finding on May 8, 2018, well after Plaintiff's alleged disability onset date of April 20, 2017. Tr. 110-13. Citing to over 300 pages of treatment notes, Plaintiff vaguely alleges that the mere existence of treatment after Dr. Mohanty's finding renders it stale (*see* ECF No. 9-1 at 29; citing Tr. 716-1021), but this is false. *See Clark v. Comm'r of Soc. Sec.*, No. 18-CV-0509-MJR, 2019 WL 3886723, at *4 (W.D.N.Y. Aug. 19, 2019) (finding an opinion was not stale because there is no evidence the plaintiff's condition significantly deteriorated); *Whitehurst v. Berryhill*, No. 1:16-CV-01005-MAT, 2018 WL 3868721, at *4 (W.D.N.Y. Aug. 14, 2018) (finding that an opinion was not stale due to a lack of meaningful deterioration).

Here, there is no evidence that Plaintiff's condition significantly deteriorated after Dr. Mohanty rendered his finding. Plaintiff points only to a June 2018 MRI of his right shoulder (Tr. 718-19), but this does not support his assertion that his shoulder impairment significantly deteriorated after May 2018. Moreover, the ALJ already considered evidence regarding Plaintiff's shoulder impairment throughout the relevant period, including after Dr. Mohanty's May 2018 assessment, and found that it reflected largely normal or mild findings. Tr. 19-20, 26. Thus, Plaintiff's assertion that Dr. Mohanty's opinion predated significant deterioration of Plaintiff's shoulder impairment is meritless.

Plaintiff also fails to prove that his knee impairments significantly deteriorated after Dr. Mohanty's May 2018 finding. Several of the records to which Plaintiff cites actually prove that his knee impairments caused minimal limitations throughout the relevant period. For instance, Plaintiff cites to Dr. O'Hara's November 2018 examination of his left knee (*see* ECF No. 9-1 at 28), but this showed that Plaintiff had full (5/5) strength in the knee and was in no acute distress. Tr. 956-57. Dr. O'Hara also reviewed an x-ray of Plaintiff's left knee and noted no gross fractures or osseous

abnormalities and found that Plaintiff's right knee was "within normal limits." Tr. 957. Dr. O'Hara's examination of Plaintiff's right knee in January 2020 was similarly mild. Tr. 1020. Finally, Plaintiff cites to Dr. Grant's assessment that Plaintiff had some scheduled loss of use of the right leg. *See* ECF No. 9-1 at 28). However, as noted above, the ALJ appropriately found a similar opinion from Dr. Grant of little probative value as it was stated in terms of vague percentages, not functional limitations related to Plaintiff's ability to perform work activities. Tr. 19. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (noting that a court may "look to other portions of the ALJ's decision and to clearly credible evidence" to find that the decision was supported by substantial evidence).

Contrary to Plaintiff's arguments, his impairments did not significantly deteriorate following Dr. Mohanty's May 2018 opinion, and the opinion was not stale. Thus, the ALJ reasonably found Dr. Mohanty's determination that Plaintiff could perform a range of medium work supported and consistent with the record, which revealed that Plaintiff's back and knee impairments were mild, including Ms. Kaminski's April 2018 finding that Plaintiff exhibited no distress and had normal range of motion and normal strength (Tr. 751) and her October 2018 finding that Plaintiff had normal strength and reflexes, no muscle atrophy, and only mild tenderness in the posterior of his left knee, with no effusion, redness, or edema (Tr. 756). Tr. 24-27.

The ALJ's RFC finding is also supported by Plaintiff's wide range of reported activities during the relevant period, which as discussed above, included hunting, traveling to Iceland, gardening, taking care of his two dogs, using public transportation, exercising at the gym, attending church, shopping, and traveling on long weekends. Tr. 25. 83, 224-30, 644, 694, 702, 716. Notably, Plaintiff also told Dr. Ippolito in April 2018 that he retired from his prior work and was "searching for and applying to multiple jobs, but has had no success in finding work." Tr. 699. This contradicts Plaintiff's allegation that he was totally disabled and could not work.

Contrary to Plaintiff's final argument, the ALJ did not assess Plaintiff's RFC based on bare medical findings and his own lay judgement. *See* ECF No. 9-1 at 22. Furthermore, the ALJ was not required to rely on an opinion that mirrored the RFC, as Plaintiff's argues. *See id*. Plaintiff's argument wrongly presumes that RFCs are medical determinations, and thus, outside the ALJ's expertise. As explained above, RFC is an administrative finding, not a medical one. Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56). The regulations explicitly state that the issue of RFC is "reserved to the Commissioner" because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ "will assess your residual functional capacity based on all of the relevant medical and other evidence," not just medical opinions. 20 C.F.R. § 404.1545(a); 20 C.F.R. §§ 404.1513(a)(1), (4), 416.913(a)(1), (4) (explaining that evidence that can be considered includes objective medical evidence, such as medical signs and laboratory findings; as well as evidence from nonmedical sources, including the claimant, such as from forms contained in the administrative record).

Thus, opinion evidence is only one type of evidence that an ALJ is required to consider. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) ("we will assess the residual functional capacity based on all the relevant medical and other evidence in your case record"); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (explaining that the adjudicator will assess the RFC based on all the relevant evidence in the case record); 20 C.F.R. §§ 404.1513(a)(1),(4), 416.913(a)(1),(4) (explaining that evidence that can be considered includes objective medical evidence, such as medical signs and laboratory findings; as well as evidence from nonmedical sources, including the claimant, such as from forms contained in the administrative record). *Matta*, 508 F. App'x at 56 ("Although the

ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Here, the ALJ's RFC finding was supported by Dr. Mohanty's determination, the opinion of consultative examiner Dr. Schwab, Plaintiff's reported activities of daily living, and the medical evidence, as discussed extensively throughout this opinion. *See* 20 C.F.R. § 404.1529(c)(3) (providing that the SSA "will consider all of the evidence presented, including information about [a claimant's] prior work record, [a claimant's] statements about [his] symptoms, evidence submitted by [his] medical sources, and observations by [the SSA's] employees and other persons").

As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

For all the reasons discussed above, the Court finds that the ALJ properly considered entire record, including the treatment reports, the medical opinions, and Plaintiff's mostly routine and conservative care, as well as Plaintiff's activities of daily living, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE